IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

ROBERT HAROLD SCOTT, JR.,

      Petitioner,

                              **CRIMINAL NO. 2:13cr164**
      v.                             **CIVIL NO. 2:17cv228**

UNITED STATES OF AMERICA,

      Respondent.

## OPINION AND ORDER

      This matter comes before the Court upon Robert Harold Scott, Jr.'s ("Petitioner") Motion Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence ("§ 2255 Motion"). ECF No. 214. Subsequent to filing such motion and in connection with same, Petitioner also filed a Motion for Discovery, ECF No. 217; a Motion for Leave to Amend based on the discoverable materials ("Motion to Amend"), ECF No. 216; a Motion for an Evidentiary Hearing, ECF No. 218; and a Motion for Leave to Supplement Petitioner's § 2255 Motion ("Motion to Supplement"), ECF No. 219. For the reasons set forth herein, Petitioner's § 2255 Motion, Motion for Discovery, Motion to Amend, Motion for an Evidentiary Hearing, and Motion to Supplement are all **DENIED**.

## I.    FACTUAL AND PROCEDURAL HISTORY

      On November 21, 2013, Petitioner was named in a criminal indictment charging him with various counts of production and receipt of child pornography. ECF No. 16. On January 9, 2014, those charges were dismissed, and Petitioner was named in a superseding criminal indictment charging him with various counts of production and receipt of child pornography as well as various counts of conspiracy to produce child pornography and use of interstate

commerce to entice a minor to engage in sexual activity. ECF No. 26. On March 5, 2014, those charges were dismissed, and Petitioner was named, along with three co-defendants, in a thirty-three-count second superseding indictment. ECF No. 39. Petitioner was charged with twenty-eight of the thirty-three counts, including five counts of Conspiracy to Produce Child Pornography, in violation of 18 U.S.C. § 2251(a) and (e) (Counts 1–5); eight counts of Production of Child Pornography, in violation of 18 U.S.C. § 2251(a) (Counts 6–13); eight counts of Receipt of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2) (Counts 15–17, 19, 21, 23, 25–26); five counts of Use of Interstate Commerce Facility to Entice Minor to Engage in Sexual Activity, in violation of 18 U.S.C. § 2422(b) (Counts 27–31); and two counts of Destruction of Records, in violation of 18 U.S.C. § 1519 (Counts 32–33). Id.

### A. PETITIONER'S MOTION TO SUPPRESS

On December 18, 2013, Petitioner, by counsel, filed a motion to suppress statements made by Petitioner during an allegedly unlawful interrogation by law enforcement on September 18, 2013 ("Motion to Suppress"). ECF No. 22. On January 3, 2014, the United States ("Government") filed its response in opposition. ECF No. 25. On March 18, 2014, Petitioner, by counsel, filed a motion to withdraw the Motion to Suppress. ECF No. 54. On that same day, the parties appeared before the Court on Petitioner's motion to withdraw. See ECF No. 55. At the hearing, the Court asked Petitioner if he consented to the withdrawal of his Motion to Suppress:

> THE COURT:     Mr. Scott, will you come forward, please.   Mr. Scott, [the motion to suppress] was an indication that perhaps a statement may have been taken from you without properly advising you of your rights under Miranda decision of the Supreme Court and the question is your counsel made a motion to suppress any statement made by you.  Now she's saying she wants to withdraw that motion.  I want to make sure that you want to withdraw that motion.
>
> DEFENDANT:     Yes, sir.

THE COURT: You understand by withdrawing the motion you will not be able, in essence, to contest the testimony, if it comes in, that you were given a Miranda warning before taking the statement from you. Do you understand that, sir?

DEFENDANT: Yes, sir.

THE COURT: And you're willing to withdraw the motion to suppress it; that is, you're willing to go ahead and approve the conduct that your counsel has made in this case. Is that correct?

DEFENDANT: Yes, sir.

3/18/2014 Hr'g Tr., ECF No. 187, at 2:19–3:14. Based on Petitioner's consent, the Court granted the motion, and Petitioner's Motion to Suppress was withdrawn. ECF No. 55.

## B. TRIAL AND SENTENCING

Petitioner's five-day jury trial began on July 8, 2014. See ECF No. 106. On July 11, 2014, at the close of the Government's evidence, the defense moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, which the Court denied. ECF No. 111. The defense did not present any evidence. Id. On July 14, 2014, the jury returned a verdict of guilty on all counts. ECF No. 113.

On November 17, 2014, the Court sentenced Petitioner to a prison term of life plus forty years. See Judgment, ECF No. 170, at 2. This term includes a term of thirty years each on Counts 1–13; a term of twenty years each on Counts 15–17, 19, 21, 23, 25–26; and a term of life each on Counts 27–31, all to be served concurrently. Id. Petitioner's prison term also includes a term of twenty years on Count 32 and a term of twenty years on Count 33, to be served consecutively to each other and to all other counts. Id.

## C. DIRECT APPEAL

On December 1, 2014, Petitioner appealed his judgment of conviction to the United States Court of Appeals for the Fourth Circuit ("Court of Appeals"). ECF No. 173. The sole

issue on appeal was whether this Court erred by admitting evidence of Petitioner's other acts of misconduct pursuant to Rule 404(b) of the Federal Rules of Evidence. ECF No. 207; United States v. Scott, 631 F. App'x 137 (4th Cir. 2016) (per curium) (unpublished). On January 20, 2016, the Court of Appeals affirmed Petitioner's conviction and sentence. Id. The mandate of the Court of Appeals issued on February 11, 2016. ECF No. 209.

### D. PETITIONER'S MOTIONS FOR POST-CONVICTION RELIEF

On April 18, 2017, Petitioner timely filed the instant § 2255 Motion and a supporting memorandum ("Pet. Mem."), ECF Nos. 214 and 215, which were docketed by the Clerk of this Court on April 24, 2017. See 18 U.S.C. § 2255(f)(1); Houston v. Lack, 487 U.S. 266, 276 (1988) (establishing prison mailbox rule). On the same day, Petitioner also filed a Motion for Discovery (ECF No. 217); Motion for Leave to Amend his § 2255 Motion based on discoverable materials (ECF No. 216); and Motion for an Evidentiary Hearing on his § 2255 Motion (ECF No. 218).

On November 6, 2017, Petitioner filed a Motion to Supplement, in which he seeks leave to supplement his § 2255 Motion with two sworn declarations. ECF No. 219; see id., Exs. 1, 2. The first declaration is dated November 18, 2016, and the second is dated March 3, 2017, both of which predate the filing of Petitioner's § 2255 Motion.

## II. § 2255 MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE

### A. STANDARD OF REVIEW

Section 2255 allows a federal prisoner to move to "vacate, set aside or correct" a federal sentence upon the following grounds: [1] that "the sentence was imposed in violation of the Constitution or laws of the United States, or [2] that the court was without jurisdiction to impose such a sentence, or [3] that the sentence was in excess of the maximum authorized by law, or [4] is otherwise subject to collateral attack." 28 U.S.C. § 2255. The Supreme Court has held that

§ 2255 is the appropriate vehicle by which a federal prisoner may challenge both his conviction and sentence. Davis v. United States, 417 U.S. 333, 343–44 (1974).

When filing a § 2255 petition, the petitioner bears the burden of proving his grounds for relief by a preponderance of the evidence. Miller v. United States, 261 F.2d 546, 547 (4th Cir. 1958)). However, a pro se petitioner is entitled to have his petition and issues asserted therein construed liberally. Gordon, 574 F.2d at 1151. Upon reviewing a § 2255 motion, the district court may, in its discretion, deny the motion without a hearing. Raines v. United States, 423 F.2d 526, 529–31 (4th Cir. 1970). But it may only do so if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). For instance, if the motion can be resolved exclusively on issues of law, and no questions of fact exist, then summary dismissal is appropriate without an evidentiary hearing. See Green v. United States, 65 F.3d 546, 548–49 (6th Cir. 1995).

### 1. Procedural Default

A § 2255 motion "may not do service for an appeal." United States v. Frady, 456 U.S. 152, 165 (1982). Issues already fully litigated on direct appeal may not be raised again under the guise of a collateral attack. Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976). And, generally, any claim that could have been raised at trial or on direct appeal, but was not, is barred as procedurally defaulted. Bousley v. United States, 523 U.S. 614, 622 (1998). However, the doctrine of procedural default excludes claims of ineffective assistance of counsel, Massaro v. United States, 538 U.S. 500, 504 (2003), as such claims are generally not cognizable on direct appeal unless the record on appeal conclusively shows ineffective assistance, United States v. Richardson, 195 F.3d 192, 198 (4th Cir. 1999) (internal citation omitted).

When a claim is procedurally defaulted, a § 2255 movant is completely barred from seeking relief on that claim unless he can show that: (1) there would be a "fundamental

5

miscarriage of justice" if relief is denied, such as being actually innocent of the crime, <u>Murray v. Carrier</u>, 477 U.S. 478, 495–96 (1986), or (2) that there is "cause" sufficient to excuse the default and "actual prejudice" resulting from the error, <u>Frady</u>, 456 U.S. at 169 (citations omitted).

The cause and prejudice standard is a "significantly higher hurdle than would exist on direct appeal." <u>Frady</u>, 456 U.S. at 166. "Cause" for a procedural default must turn on something external to the claim or defense itself, <u>Murray</u>, 477 U.S. at 488, which, courts have consistently held, includes ineffective assistance of counsel. <u>United States v. Breckenridge</u>, 93 F.3d 132, 134 n.1 (4th Cir. 1996) (collecting cases); <u>see also</u> <u>Smith v. Dixon</u>, 14 F.3d 956, 973 (4th Cir. 1994) (noting in the context of a § 2254 motion that "an attorney's ineffectiveness may constitute cause for excusing a procedural default" if the petitioner can show that he had a constitutional right to effective assistance of counsel and that such assistance was constitutionally ineffective). To show "actual prejudice," a habeas petitioner must demonstrate that the claimed error worked to "his actual and substantial disadvantage." <u>Satcher v. Pruitt</u>, 126 F.3d 561, 572 (4th Cir. 1997) (internal citation omitted); <u>see also</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 116 (2007) (defining "actual prejudice" as a "substantial and injurious effect or influence in determining the jury's verdict") (citation omitted).

### 2. Reviewing Claims of Ineffective Assistance of Counsel

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel both during trial and on first appeal as of right. <u>Evitts v. Lucey</u>, 469 U.S. 387, 396 (1985). To succeed on an ineffective assistance of counsel claim, a petitioner must satisfy the two-prong test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), by showing (1) deficient performance of counsel and (2) resulting prejudice.

To satisfy the first prong, the petitioner must show that counsel's performance fell below an objective standard of reasonableness. <u>Id.</u> at 690. To do so, the petitioner must articulate

specific acts or omissions whereby counsel's performance fell "outside the wide range of professionally competent assistance." Id. When reviewing the propriety of these alleged acts or omissions, courts must give substantial deference to defense counsel's strategic judgments. Id. at 689–90. Indeed, "[o]nce counsel conducts a reasonable investigation of law and facts in a particular case, his strategic decisions are 'virtually unchallengeable.'" Powell v. Kelly, 562 F.3d 656, 670 (4th Cir. 2009) (quoting Strickland, 466 U.S. at 690 (petitioner must overcome the presumption that the challenged action might be considered sound trial strategy)).

To satisfy the second prong under Strickland, the petitioner must show that he was prejudiced by counsel's deficient performance. In other words, petitioner must show that it is "reasonably likely" that, but for counsel's unprofessional errors, the result of the proceedings would have been different. Harrington v. Richter, 562 U.S. 86, 111–12 (2011) (citing Strickland, 466 U.S. at 696). "The likelihood of a different result must be substantial, not just conceivable." Id. (citing Strickland, 466 U.S. at 693). The burden is on the petitioner to affirmatively prove prejudice. Strickland, 466 U.S. at 693. Furthermore, if a petitioner fails to satisfy either prong of the Strickland test, a reviewing court need not consider the other element. United States v. Roane, 378 F.3d 382, 404 (4th Cir. 2004).

## B.    PETITIONER'S § 2255 MOTION

In his § 2255 Motion, Petitioner claims that this Court should vacate his conviction and sentence because he received ineffective assistance of counsel in violation of his Sixth Amendment rights. Pet. Mem., ECF No. 215. Specifically, Petitioner claims that defense counsel rendered ineffective assistance in four ways:[1] (1) failing to file a motion to suppress statements and other evidence; (2) failing to request a Franks hearing with respect to his search

---

[1] Petitioner's memorandum actually identifies five ways, but the third and fourth overlap and thus are merged herein for efficiency purposes. See ECF No. 215.

warrant; (3) failing to present a defense or call witnesses at trial; and (4) committing several small errors that had the "cumulative effect" of ineffective assistance. Id. at 9–36. The Court will address each in turn.

### 1. Failure to File a Motion to Suppress

Petitioner first argues that defense counsel was ineffective by failing to file a motion to suppress the following evidence: (i) statements made by Petitioner while being interrogated by law enforcement on September 18, 2013, and (ii) evidence recovered from Petitioner's cell phone after it was seized by law enforcement on September 18, 2013. Pet. Mem., ECF No. 215, at 9–19. In order to prevail on an ineffectiveness claim based upon counsel's failure to file a motion to suppress, a petitioner must show that counsel's performance was deficient by demonstrating that the "unfiled motion would have had 'some substance,'" Grueninger v. Dir., Virginia Dep't of Corr., 813 F.3d 517, 525 (4th Cir. 2016) (quoting Tice v. Johnson, 647 F.3d 87, 104 (4th Cir. 2011)), and must show prejudice by demonstrating both "(1) that the motion was meritorious and likely would have been granted, and (2) a reasonable probability that granting the motion would have affected the outcome of his trial," id. (quoting Kimmelman v. Morrison, 477 U.S. 365, 375 (1986)).

### a. Petitioner's Statements to Law Enforcement

Petitioner argues that defense counsel should have filed a motion to suppress the statements he made to law enforcement on September 18, 2013, because such statements were made during a custodial interrogation during which Petitioner did not receive Miranda warnings. At the outset, the Court notes that defense counsel initially filed a motion to suppress on this exact issue, arguing that "[Petitioner] was subjected to a custodial interrogation [on September 18, 2013] without receiving Miranda warnings." ECF No. 22 at 6. As noted above, defense counsel later withdrew this motion to suppress, a decision to which Petitioner expressly

consented before the Court. See supra Part I.A.

It is apparent from the record that the decision to withdraw the suppression motion was based on the sound judgment of defense counsel that such motion was without merit. Just before the motion was withdrawn, the Government filed its response in opposition, which detailed the circumstances of Petitioner's arrest and interrogation. ECF No. 25. The Government explained that, on September 18, 2013, Special Agent Paul Wolpert of Homeland Security Investigations ("HSI") executed a search warrant of Petitioner's residence; Agent Wolpert arrived at Petitioner's residence just before 8:00 a.m.; Agent Wolpert asked Petitioner to speak with him in Agent Wolpert's vehicle while the search was being conducted; Petitioner consented to relocating to Agent Wolpert's vehicle; and upon reaching the vehicle, at approximately 8:00 a.m., Agent Wolpert read Petitioner a typed sheet of Miranda warnings before asking Petitioner any further questions.[2] ECF No. 25 at 6. Because Agent Wolpert's account of the interrogation directly contradicted the sole basis of Petitioner's motion to suppress, it is clear that such motion lacked "substance." Tice, 647 F.3d at 104. Even though Petitioner maintains that he was not Mirandized on the night of his arrest, he cannot show – in light of HSI Agent Wolpert's likely testimony – that the motion to suppress Petitioner's statements was "meritorious and likely would have been granted." Grueninger, 813 F.3d at 525. Therefore, Petitioner cannot prevail on his claim for ineffective assistance of counsel on that ground.

b.  Evidence from Petitioner's Cell Phone

Petitioner also argues that defense counsel was ineffective for failing to file a motion to

---

[2] The sheet contained the following: "You have the right to remain silent. Anything you say can be used against you in court, or other proceedings. You have the right to consult an attorney before making any statement or answering any questions. You have the right to have an attorney, one will be appointed for you before any questioning, if you wish. If you decide to answer questions now, you still have the right to stop the questioning at any time, or to stop questioning for the purpose of consulting an attorney." Id. at 6–7.

suppress the evidence obtained from his cell phone that was seized during the search of his residence on September 18, 2013. ECF No. 215 at 18. In support, Petitioner claims that, while law enforcement officers had a warrant to search his residence, they did not have a separate warrant to search the contents of his cell phone. Id. at 19. However, this claim is plainly refuted by the record. The search warrant obtained by Agent Wolpert on September 17, 2013, contained an attachment ("Attachment B") which expressly includes among the "items to be seized" any and all materials, records, or documents depicting, containing, or pertaining to "the possession, receipt, distribution and/or reproduction of child pornography," as well as "any record or documents which shows the offer to transmit through interstate commerce any depictions of a minor engaged in sexually explicit conduct." See Search and Seizure Warrant, Case No. 2:13ms203, Trial Exhibit RS-14, Attachment B. The Attachment expressly states that "the terms records, documents, programs, application or materials" used therein include those "created, modified or stored in any form," including electronically. Id. (emphasis added). Therefore, Agent Wolpert's search warrant clearly authorized the seizure of Petitioner's cell phones and other electronic devices and a search for evidence contained therein. For this reason, Petitioner's claim that defense counsel should have moved to suppress the cell phone evidence in his case is baseless.

## 2. Failure to Request a <u>Franks</u> Hearing

Petitioner next argues that his defense counsel was ineffective for failing to request a Franks hearing. In Franks v. Delaware, the Supreme Court held that a defendant challenging the validity of a search warrant is entitled to a hearing if he makes a preliminary showing that: (1) officers knowingly or recklessly made false statements or made a statement with "reckless disregard for the truth" and (2) the allegedly false statement or omission was material. 438 U.S. 154, 155–56, 171 (1978). In his § 2255 Motion, Petitioner claims that the search warrant

executed in his case was based on either (1) the unreliable hearsay of a confidential informant, Ms. Latouche's best friend, or (2) Ms. Latouche herself who was involved in the criminal offense and thus was motivated to lie. ECF No. 215 at 21. For these reasons, Petitioner purportedly made multiple requests to defense counsel to request a <u>Franks</u> hearing to challenge the search warrant, but defense counsel declined to do so. <u>Id.</u> at 22.

As a threshold matter, Petitioner's claim that the search warrant was based on hearsay and/or the accusations of Ms. Latouche is without merit. According to testimony at trial, the investigation into Petitioner's offense began in July, 2013, when a confidential informant made a complaint to the Chesapeake Police Department ("CPD") that Ms. Kanealeen Latouche made pornographic videos of her two children, ages 2 and 3. Trial Tr., ECF No. 220:12–221:18. Sergeant Person of the CPD and Agent Wolpert of HSI then began an investigation into Ms. Latouche. With Ms. Latouche's consent, the officers seized her cell phone, which contained evidence that she made pornographic videos of her children. <u>Id.</u> at 228:10–229:12. She was arrested shortly thereafter. <u>Id.</u> A forensic report of her cell phone revealed several emails and text messages between Ms. Latouche and an individual identified as "Mike Pyro," who solicited the pornographic material of Ms. Latouche's children and then attempted to use such material for extortion. <u>Id.</u> at 265:2–6. On July 31, 2013, Agent Wolpert issued a Customs Summons to Google Inc. and to multiple texting application companies for information concerning the email address and phone numbers associated with Mike Pyro. <u>Id.</u> at 263:1–24. From the responses, Agent Wolpert was able to link Mike Pyro to an address in Virginia Beach at which Petitioner resided. Based on all of this information, Agent Wolpert secured a warrant to search Petitioner's residence. <u>See</u> Application for Search Warrant, Trial Exhibit RS-14, at 9.

In his § 2255 Motion, Petitioner has not shown or even alleged that Agent Wolpert

knowingly or recklessly made false statements or statements with a "reckless disregard for the truth" in securing this search warrant. Therefore, Petitioner has presented no support for his claim that his attorney erred by not requesting a <u>Franks</u> hearing. Accordingly, Petitioner's claim of ineffective assistance of counsel based on same is without merit.[3]

### 3. Failure to Present a Defense or Call Witnesses at Trial

Petitioner next argues that defense counsel were ineffective because they failed to present an affirmative defense or call any witnesses at trial. ECF No. 215 at 27, 32. Specifically, Petitioner claims that defense counsel told the jury during opening statements that the defense would show that other individuals could have committed the offense, but then "never provided this defense, or any defense for that matter to the jury." <u>Id.</u> at 28. Petitioner adds that defense counsel "'rested' immediately after the Government's case-in-chief." <u>Id.</u> In order to assess the merits of this claim, it is first necessary to summarize the evidence against Petitioner at trial.

### a. Summary of the Evidence at Trial

At trial, the Government presented evidence that, between 2012 and 2013, Petitioner entered into five conspiracies with five different women to produce child pornography involving seven minor victims: Jane Doe 1, 2, 3, and 4, and John Doe 1, 2, and 3. The Government also presented evidence that Petitioner requested and received images of such child pornography via the internet, and that he destroyed evidence of his crime with respect to two of the conspiracies. Crucial to the Government's case was proving that Petitioner used certain phone numbers, email addresses, and other internet identities to communicate with his co-conspirators. <u>See</u> <u>infra</u> at 16–17. An outline of the evidence pertaining to each conspiracy follows.

---

[3] Petitioner also argues that he was never afforded the opportunity to cross examine the confidential informant who initially reported Ms. Latouche to the CPD, which violated "his 6th Amendment right to confrontation." ECF No. 215 at 27. This argument is also without merit because statements made by the confidential informant were never offered as evidence against Petitioner at trial.

## Conspiracy #1 – Kanealeen Latouche

Ms. Latouche testified that, in 2012 and 2013, she was living with her mother in Chesapeake along with her two children, a 3 year-old son (John Doe 3) and a 2 year-old daughter (Jane Doe 4). Tr. at 485:4–14. In October, 2012, a woman unknown to Ms. Latouche, named "Olivia Rose," contacted her via Facebook and asked her if she wanted to make some money. Tr. at 488:17–489:6. When Ms. Latouche responded "yes," Olivia Rose instructed her to contact a person named "Mike Pyro" at pyro75747@gmail.com with naked pictures of herself. Tr. at 489:8–489:23. On October 29, 2012, Ms. Latouche initiated contact with Mike Pyro as instructed. Tr. at 490:6–17. Mike Pyro initially told Ms. Latouche that she could make money by throwing a party during which she would perform sex acts. Tr. at 490:17–25. A short time later, a woman named "Jasmine," previously unknown to Ms. Latouche, contacted her via Facebook and they exchanged phone numbers. Tr. at 493:15–25. In April, 2013, Ms. Latouche and Jasmine texted each other, during which Jasmine claimed to know Olivia Rose and encouraged Ms. Latouche to participate in one of Mike Pyro's sex parties. Tr. at 495:3–496:1, 497:14–15. Jasmine provided Ms. Latouche with Mike Pyro's phone number: (757) 214-6379. Tr. at 497:24–498:1. Jasmine's phone number was (757) 349-6440. Tr. at 498:5.

On April 23, 2013, Ms. Latouche texted Mike Pyro to express interest in doing a sex party. Tr. at 499:5, 501:23. Mike Pyro asked Ms. Latouche to bring her children to the sex parties, which she initially refused. Tr. at 502:10–12. He then offered her $15,000 to bring her children. Tr. at 502:13. He specifically offered $20,000 if Jane Doe 4 would perform a hand job. Tr. at 504:4–7. Ms. Latouche further testified that Mike Pyro instructed her to record videos of her performing sex acts on her children and of the children performing sex acts on each other, which she did. Tr. at 507:2–508:25. Ms. Latouche confirmed that she sent multiples emails to Mike Pyro containing such videos. Tr. at 508:20–25. The relevant portions of all text messages, emails, and videos described above were admitted into evidence and presented to the jury.

## Conspiracy #2 – Shaniesta Banks.

Ms. Banks testified that, between February and April of 2013, she lived in Virginia Beach. Tr. at 524:18–22. In February, 2013, a woman unknown to Ms. Banks, named "Olivia Rose," contacted her via Facebook and asked her if she wanted to make some money by "dancing," meaning stripping. Tr. at 526:16–20; 527:6–14. When Ms. Banks responded "yes," Olivia Rose instructed her to email a person named "Mike Pyro" at pyro75747@gmail.com with pictures of herself and her genitalia. Tr. at 527:15–25; 528:13–14. On February 21, 2013, Ms. Banks emailed Mike Pyro as instructed. Tr. at 528:10–529:4. In response, Mike Pyro instructed her to send additional pictures to him via text at (757) 214-6379. Tr. at 529:8–14. After Ms. Banks texted Mike Pyro, he told her that she could make $100,000 by throwing sex parties for various men during which she would engage in sexual intercourse with them. Tr. at 530:14–25. Ms. Banks agreed to host a sex party and rented a hotel room from February 22–25, 2013 for that

purpose. Tr. at 533:12–22. Only one person named "Rob Base" showed up to the party on the first two nights. Tr. at 535:9–538:3. Ms. Banks confirmed at trial that Petitioner was Rob Base. Tr. at 538:2–6. After that time, Mike Pyro asked Ms. Banks about her siblings, and she confirmed that she had a four year-old sister (Jane Doe 2). Tr. at 538:19–25. Mike Pyro offered Ms. Banks $150,000 to record a video of Jane Doe 2 and Ms. Banks performing oral sex on each other, to which Ms. Banks agreed. Tr. at 539:1–13. Ms. Banks testified that she made such video on her iPhone and then emailed the video to Mike Pyro. Tr. at 539:14–540:17. Mike Pyro expressed dissatisfaction with the video and threatened that, unless Ms. Banks recorded another video of the same activity and sent it to him, he would put her other videos on the internet. Tr. at 550:19–551:1. On March 13, 2013, Ms. Banks complied with his demand and emailed him another video of her and Jane Doe 2 engaging in sexual activity. Tr. at 550:5–551:1. On March 28, 2013, Mike Pyro instructed Ms. Banks to film another video at a hotel room. Tr. at 553:9–24. Rob Base (Petitioner) showed up to the hotel room, saying that Pyro sent him. Tr. at 554:9–16. Petitioner and Ms. Banks then filmed themselves having sex while Jane Doe 2 was lying naked next to them on the bed. Tr. at 555:11–23. The relevant portions of all text messages, emails, and videos described above were admitted into evidence and presented to the jury.

### <u>Conspiracy #3 – Nina Calderon</u>

Ms. Calderon testified that, in 2013, she was living in Portsmouth with her two year-old daughter (Jane Doe 3). Tr. at 623:19–24. In March, 2013, a woman unknown to Ms. Calderon, named "Olivia Rose," contacted her via Facebook and asked her if she wanted to make some money by hosting hotel parties. Tr. at 625:10–19. When Ms. Calderon responded "yes," Olivia Rose instructed her to email a person named "Mike Pyro" at pyro75747@gmail.com expressing her interest. Tr. at 625:21–24; 627:4–6. On March 27, 2013, she emailed Mike Pyro as instructed and asked him about hosting sex parties. Tr. at 627:1–19. He requested that she email six nude pictures of herself. Tr. at 627:19–21. On March 28, 2013, Ms. Calderon booked a hotel room for the purpose of hosting a sex party. Tr. at 628:14–20. An unknown male, whom Ms. Calderon identified at trial as the Petitioner, showed up at the hotel room later that night and had sex with Ms. Calderon. Tr. at 630: 3–23. After expressing dissatisfaction with the party, Mike Pyro then requested via text message that Ms. Calderon host another hotel party with Jane Doe 3 present. Tr. at 631:15–23. Ms. Calderon refused, at which time Mike Pyro suggested that she make a video with Jane Doe 3 performing oral sex instead. Tr. at 632:9–15. Ms. Calderon agreed and, on March 31, 2013, she recorded the video. Tr. at 632:17–633:2. She then sent the video to Mike Pyro via email. Tr. at 633:7–24. Two days later, Olivia Rose began threatening Ms. Calderon via Facebook that she would release her videos to the public. Tr. at 634:22–635:8, 636:19–24. The relevant portions of all text messages, emails, and videos described above were admitted into evidence and presented to the jury.

## Conspiracy #4 – Sierra Halsey

Ms. Halsey testified that, in 2013, she was living in Suffolk with her mother and five year-old brother (John Doe 1). Tr. at 641:13–21. At that time, Ms. Halsey also often cared for her one year-old nephew (John Doe 2). Tr. at 642:22–643:4. In March, 2013, a woman unknown to Ms. Halsey, named "Olivia Rose," contacted her via Facebook and asked her if she wanted to make some money by dancing and by hosting hotel parties. Tr. at 644:24–645:14. Olivia Rose instructed her to contact a person named "Mike Pyro" with a picture of herself. Tr. at 645:18–646:24. On March 12, 2013, Ms. Halsey contacted Mike Pyro by email at pyro75747@gmail.com to express interest in hosting a sex party. Tr. at 646:16–647:6. In response, he requested that she text him at (757) 214-6379. Tr. at 647:8. Via text message, he requested that Ms. Halsey first attend a "sample party" with his acquaintance, "Rob Base," whom she identified at trial as the Petitioner. Tr. at 647:24–649:20. A couple nights later, she showed up at a hotel where Rob Base (Petitioner) and some of his friends were located for this "sample party." Tr. at 650:3–6. After it was over, Mike Pyro confirmed that the sample party went well and offered her $120,000 to host a real party. Tr. at 651:1–16. Ms. Halsey agreed and hosted a second party, but only Rob Base (Petitioner) attended it. Tr. at 652:1–17. During such party, Ms. Halsey and Petitioner made several sex videos together, but Mike Pyro was dissatisfied with them and demanded that Ms. Halsey host yet another party. Tr. at 652:17–653:2. He also asked Ms. Halsey to bring her nephew (John Doe 1) and brother (John Doe 2) to the party. Tr. at 666:18. When Ms. Halsey refused, he offered her $150,000, and she eventually agreed. Tr. at 667:1–15.

On March 26, 2013, Ms. Halsey hosted a third party, and brought John Doe 1 with her to the party. Tr. 654:8–16. Mike Pyro also asked Ms. Halsey via text message to make certain sex videos with her five year-old brother (John Doe 2) in order to get paid. Tr. at 667:21–668:6; 670:7. Ms. Halsey made such a video, and on April 12, 2013, she emailed it to Mike Pyro. Tr. at 668:9–25. She made two additional videos involving John Doe 1 at Mike Pyro's request and emailed them to Mike Pyro in April, 2013. Tr. at 669:25–670:10. Mike Pyro expressed dissatisfaction with the videos and requested that Ms. Halsey make a video with her one year-old nephew (John Doe 2) instead. Tr. at 671:15–20. She agreed, and made a video of her performing sex acts on John Doe 2 as Mike Pyro instructed. Tr. at 672:24–673:10. She sent such video to Mike Pyro via email on April 19, 2013. Tr. at 671:2–5, 673:4–6. Mike Pyro expressed dissatisfaction with the video and requested that Ms. Halsey bring her one year-old nephew (John Doe 2) to a sex party instead. Tr. at 673:13–18. Ms. Halsey agreed and brought John Doe 2 to a hotel room where Rob Base (the Petitioner) was present. Tr. at 674:9–17. At Mike Pyro's instruction, she and Rob Base then recorded a video of them having sex while Ms. Halsey performed oral sex on John Doe 2. Tr. at 674:18–675:9. She then sent such video to Mike Pyro via email. Tr. at 675:14. Mike Pyro frequently threatened to make Ms. Halsey's sex videos public as a means of exerting control over Ms. Halsey. Tr. at 677:9–15.

Around this time, Ms. Halsey began a dating relationship with Rob Base (Petitioner). Tr. at 677:22–678:4. After Petitioner was arrested in September, 2013, he instructed Ms. Halsey via phone calls at the jail to delete his Pyro email account and to delete the Facebook page of Olivia Rose. Tr. at 679:25–680:11. At trial, Ms. Halsey heard and identified five different jail calls between her and Petitioner confirming same. Tr. at 680:19–684:22, 685:8–15, 686:1–7. On September 22, 2013, Ms. Halsey successfully deleted the pyro75747@gmail.com email account as instructed by Petitioner. Tr. at 685:15–25. Petitioner also instructed her to delete two texting apps on his phone, one called "textPlus" and the other called "Pinger." Tr. at 686:17–23. She explained that one number was used for Olivia Rose and the other was used for Mike Pyro. Tr. at 686:25. Petitioner further instructed Ms. Halsey to meet with his attorneys and tell them that his friend named "Skrillz" frequently visited his house and used Petitioner's phone and computer. Tr. at 688:5–23.

### Conspiracy #5 – Shavonna Whitfield

Ms. Whitfield did not testify because, at the time of Petitioner's trial, she had pled not guilty to related charges and was awaiting her own trial. However, Agent Wolpert testified to a variety of email and text exchanges between Ms. Whitfield and Mike Pyro. For example, he discovered several emails containing nude images of both Ms. Whitfield and Jane Doe 1 that were sent to Mike Pyro's email address in November, 2012. Tr. at 352:14–18. The IP address linked to Ms. Whitfield's email account matches Ms. Whitfield's residence; the phone number she used is linked to her name and address; and Agent Wolpert was able to identify Ms. Whitfield in the videos because he arrested Ms. Whitfield and knew what she looked like. Tr. at 375:2–9; 376:16–23. Agent Wolpert also recovered text messages between Ms. Whitfield and Mike Pyro in which Mike Pyro asked her to attend sex parties and to bring her minor children along. Tr. at 354:6–21. Agent Wolpert further testified about text messages between Ms. Whitfield and Mike Pyro in which she agrees to send erotic pictures of Jane Doe 1 for $15,000. 360:4–16. Ms. Whitfield emailed such pictures to Mike Pyro on November 24, 2012. Tr. at 361:4–8.

### Proof of Petitioner's Identity

To prove that Petitioner was involved in each of the above conspiracies, the Government presented extensive evidence at trial that Petitioner was the person behind every relevant communication with the co-conspirators: that he was "Olivia Rose" and "Jasmine" on Facebook, who used the phone number (757) 349-6440; that he was "Mike Pyro" using the email address pyro75747@gmail.com and the phone number (757) 214-6379; and that he was the person known as "Rob Base." Specifically, HSI Agent Wolpert, who testified at trial as an expert in

16

computer forensics and online child exploitation investigations that involve the internet, Tr. at 707:12–17, testified to the following facts in order to prove Petitioner's various identities:

- The phone number used by "Mike Pyro," (757) 214-6379, was owned by company called GOGII, Inc., also known as textPlus, which administers a free texting app for cell phones. Tr. at 280:25–281:21. In a response to a subpoena about this number, textPlus confirmed that the number was registered to a user named "pyro75747" and to an email address of pyro75747@gmail.com, which was linked to an Android phone, Model LS855. Tr. at 286:16–18, 288:10-16.

- The phone number used by both "Jasmine" and "Olivia," (757) 349-6440, was owned by a company called Pinger, Inc., which administers a free texting app for cell phones. Tr. at 289:20–292:24, 292:7–9. In a response to a subpoena about this number, Pinger confirmed that the number was registered to a user named "Livia75747," which was linked to the same Android device described above. Tr. at 292:10–293:12.

- This same Android device had four different email accounts associated with it, including "rbase757@gmail," "robertscott265@gmail," and "pyro75747@gmail." Tr. at 295:10–13.

- This same Android device was found in Petitioner's residence and was seized by law enforcement on the night he was arrested. Tr. at 323:24–324:4.

- The memory card from Petitioner's Android phone contained videos and images of Ms. Calderon and Jane Doe 3, Tr. at 718:22–25, 722:11–13, and of Ms. Banks and Jane Doe 2, Tr. at 720:18–24. The memory card also included photos that each co-conspirator had received from Mike Pyro. Tr. at 735:14–736:21.

- Agents extracted emails from this same Android phone, including emails from Ms. Halsey containing videos of her, John Doe 2, and Petitioner in a hotel room. Tr. at 725:12–15.

- This same phone's contacts included a contact named "Ma," which matched the phone number of Petitioner's mother. Tr. at 724:18–22.

- The IP address associated with the conversations between Mike Pyro and Ms. Latouche originated from an address in Virginia Beach, where Petitioner resided. Tr. at 306:23–307:5.

- In response to a subpoena regarding the Mike Pyro's email address and textPlus

account, MegaPath, an internet service provider ("ISP"), confirmed that both the Mike Pyro email address and the Mike Pyro textPlus account were accessed from the same hotel in Virginia Beach where several of the co-conspirator's sex parties occurred and which Rob Base attended. Tr. at 726:18–24, 727:11–21.

- In addition, MegaPath's subpoena response confirmed that the last time the textPlus app was used by Mike Pyro was September 18, 2013, just hours before Petitioner was arrested. Tr. at 751:10–15.

- According to a subpoena response from Google Inc., Mike Pyro's email address was deactivated on September 22, 2013, Tr. at 737:20–22, which is consistent with Ms. Halsey's testimony that she deactivated the account on that day.

- In response to a subpoena regarding Mike Pyro's textPlus account, Cox Communications confirmed that, on numerous days between 2012 and 2013, this account was accessed from the IP address matching Petitioner's residence in Virginia Beach. Tr. 739:14–741:21. For example, the IP address matched Petitioner's residence on days that Mike Pyro received emails containing child pornography produced by Ms. Halsey, Tr. at 749:1–9, and on each day Mike Pyro received communications from Ms. Latouche, Tr. at 749:22–750:1. In many other instances, the IP address matched one of the two hotels that Rob Base (Petitioner) visited for various sex parties with Petitioner's co-conspirators. Tr. at 747:18–748:9.

b. Petitioner's Defense at Trial

Petitioner claims that defense counsel failed to present a defense at his trial and simply "rested" after the close of the Government's evidence. However, this claim is plainly refuted by the record. While the defense did not put on its own evidence, defense counsel repeatedly suggested through opening argument and cross-examination that other individuals may have acted as "Mike Pyro." For example, during the cross-examination of Ms. Banks, defense counsel emphasized that Ms. Banks had never met Mike Pyro or spoken to him on the phone, and confirmed that other individuals, including Skrillz and Nick Oliver, had attended Ms. Banks' sex parties. Tr. at 565:22–567:8. During the cross-examination of Mr. Harmon (Petitioner's stepfather with whom Petitioner resided), defense counsel asked several questions about Petitioner's friends coming and going from the home and possibly using the home's Wi-Fi. Tr.

at 617:14–618:23. During the cross-examination of Ms. Halsey, defense counsel confirmed that a good friend of Ms. Halsey once told Ms. Halsey that she met Olivia Rose in person. Tr. at 692:1–11. Defense counsel also confirmed that Ms. Halsey told Agent Wolpert that she often received communications from Mike Pyro at the same time she was hanging out with Petitioner. Tr. at 693:2–9. Moreover, during the cross-examination of Agent Wolpert, defense counsel confirmed that one memory card can be moved from one cellular device to another and that virtual private networks can create a "virtual tunnel" between two different electronic devices so that the devices act as one. Tr. at 753:6–7, 754:18–25. All of these examples belie Petitioner's claim that his attorneys failed to present the defense of mistaken identity.

Petitioner also emphasizes that his attorneys failed to call witnesses in his defense. ECF No. 215 at 33. He specifically identifies Doree Sanders, who was subpoenaed by defense counsel but was never called to testify. Id. at 34. According to Petitioner, Ms. Sanders would have testified that other individuals, including "Skrillz," had access to Petitioner's phone and texting applications and thus could have committed the offense. Id. However, Petitioner has not presented any evidence to overcome this Court's presumption that defense counsel's choice not to call Ms. Sanders was sound trial strategy. Strickland, 466 U.S. at 690. Indeed, defense counsel could have had several legitimate reasons for this decision, including lack of credibility, weakness of the evidence, and/or the risk of opening unwanted evidentiary doors. Therefore, Petitioner has not met his burden to show that this decision fell below an objective standard of reasonableness, which is necessary to state a claim under Strickland.

### c. Petitioner Cannot Show Prejudice

In any event, even if Petitioner could show that his attorneys erred in their trial strategy, his ineffectiveness claim would still fail because he cannot show prejudice. As outlined in great detail above, the evidence presented against Petitioner at trial was overwhelming. Through the

19

testimony of Petitioner's co-conspirators, coupled with extensive phone and email records, the Government showed a disturbing and consistent pattern in which the Petitioner made initial contact with his co-conspirators; made promises of money in exchange for sex parties; demanded more and more illicit activities culminating in demands for pornographic images of minor children; received such images via email; and then used them for extortion. The various identities that Petitioner used to orchestrate and hide these activities were all linked to the same phone (Petitioner's phone) and to the same address (Petitioner's address). While the defense suggested that multiple people could have had access to these online identities, not a single witness identified any other person using Petitioner's devices or accessing the password-protected internet at Petitioner's home. Moreover, the only person proven to know the log-in and password information for all of the various identities was Petitioner, which was confirmed by his girlfriend, Ms. Halsey, who testified that Petitioner provided her such information after his arrest so that she could delete his accounts. This testimony was corroborated by recorded jail phone calls between Petitioner and Ms. Halsey after his arrest. Based on this and all of the other evidence outlined above, Petitioner has not and cannot show that it is "reasonably likely" that, but for counsel's alleged errors, the result of the trial would have been different. Harrington, 562 U.S. at 111–12 (citation omitted). For this reason too, Petitioner's third claim of ineffective assistance of counsel is without merit.

### 4. Commission of Cumulative Errors at Trial

Lastly, Petitioner argues that defense counsel committed several small errors "that were wide spread enough and prejudicial enough to have fatally infected the petitioners [sic] trial" and therefore amount to ineffective assistance of counsel under the "cumulative error doctrine." ECF No. 215 at 35. These alleged errors include failure to properly impeach law enforcement officers, failure to file pretrial motions, and failure to present a defense at trial. Id. at 35–36.

Just as with Petitioner's previous ineffectiveness claim, this claim fails because he cannot show prejudice. Petitioner cannot affirmatively show that, had his attorneys altered their trial strategy, added a few questions on cross-examination, or called some of Petitioner's friends as witnesses that the result of his trial would likely have been different. These changes would not have overcome the overwhelming evidence of Petitioner's guilt, including the extensive evidence that Petitioner was acting as "Mike Pyro" at all times relevant to the crimes. See supra Part II.B.3. For this reason, Petitioner's fourth claim of ineffective assistance of counsel is without merit.

## C.    CONCLUSION

For the reasons above, Petitioner has failed to satisfy the two-prong test of Strickland with respect to any of his ineffective assistance of counsel claims. Therefore, he has not stated a claim for relief under 28 U.S.C. § 2255. Accordingly, Petitioner's §2255 Motion must be and is hereby **DENIED**.

## III.    PETITIONER'S MISCELLANEOUS MOTIONS

As noted previously, Petitioner also filed several miscellaneous motions in connection with his § 2255 Motion, which are now before the Court. These include Petitioner's Motion for Discovery, ECF No. 217; Motion for Leave to Amend based on the discoverable materials ("Motion to Amend"), ECF No. 216; Motion for an Evidentiary Hearing, ECF No. 218; and Motion for Leave to Supplement Petitioner's § 2255 Motion ("Motion to Supplement"), ECF No. 219.

The first three motions sound in Rules 6 and 8 of the Rules Governing § 2255 Proceedings. Rule 6 provides that a "judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal or Civil Procedure[.]" Rule 8 provides that, "if the [§2255] motion is not dismissed, the judge must review the answer, any transcripts and

records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." As stated above, the Court may deny a § 2255 motion without an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

In this case, the Court reviewed Petitioner's § 2255 Motion, supporting memorandum, and the entire record of his case and conclusively found that Petitioner is not entitled to the relief that he requests in his motion. See supra Part II. For this reason, the Court finds that it would be futile to conduct an evidentiary hearing or to permit Petitioner to conduct discovery and therefore **DENIES** Petitioner's requests for same. ECF Nos. 217, 218. Furthermore, because Petitioner's Motion to Amend, ECF No. 216, is premised entirely on this Court permitting him to conduct discovery, such motion is also **DENIED**.

Finally, with regard to Petitioner's Motion for Leave to Supplement, ECF No. 219, the Court notes that the Rules Governing Section 2255 Proceedings do not speak to the proper procedure for amending § 2255 motions. Therefore, courts typically apply Rule 15 of the Federal Rules of Civil Procedure ("Rule 15") to the amendment of § 2255 motions. See United States v. Pittman, 209 F.3d 314, 317 (4th Cir. 2000). As Petitioner seeks to supplement his § 2255 Motion well in excess of twenty-one days past its filing,[4] Rule 15(a) provides that Petitioner may only do so "with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). The rule further states that the Court "should freely give leave when justice so requires." Id. If the Court denies a motion to amend, it must provide a "justifying reason," such as prejudice to the opposing party, bad faith by the movant, or futility. Equal Rights Ctr. v. Niles Bolton Assocs., 602 F.3d 597, 603 (4th Cir. 2010) (citation omitted). In the instant case,

---

[4] Petitioner's Motion to Supplement was received by the Clerk of the Court of Appeals more than six months later after his § 2255 was filed. See ECF No. 219.

the Court finds that granting Petitioner leave to supplement his § 2255 Motion would be futile because such motion has failed to state a claim for relief under § 2255. See supra Part II. Indeed, Petitioner's proposed supplementary documents, ECF Nos. 219-1 and 219-2, would not alter the Court's finding with respect to his ineffectiveness claims given Petitioner's inability to show prejudice under Strickland. See discussion supra Part II.B.3. For this reason, the Court **DENIES** Petitioner's Motion to Supplement. ECF No. 219.

## IV.    CONCLUSION

In summary, for the reasons stated herein, the Court hereby **ORDERS** as follows:

1) Petitioner's Motion Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence is **DENIED**. ECF No. 214.

2) Petitioner's Motion for Leave to Amend his § 2255 Motion is **DENIED**. ECF No. 216.

3) Petitioner's Motion for Discovery pursuant to Rule 6 of the Rules Governing § 2255 is **DENIED**. ECF No. 217.

4) Petitioner's Motion for an Evidentiary Hearing is **DENIED**. ECF No. 218.

5) Petitioner's Motion for Leave to Supplement his § 2255 Motion is **DENIED**. ECF No. 219.

Petitioner is **ADVISED** that he may appeal from this final Order by submitting a written notice of appeal to the Clerk of the United States District Court, United States Courthouse at 600 Granby Street, Norfolk, Virginia 23510. Such written notice must be received by the Clerk within sixty (60) days from the date of this Order. However, because Petitioner has failed to demonstrate "a substantial showing of the denial of a constitutional right," the Court shall not issue a certificate of appealability pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure. See Miller-El v. Cockrell, 537 U.S. 322, 336 (2003); 28 U.S.C. § 2253(c).

The Clerk is **DIRECTED** to forward a copy of this Order to Petitioner and to the United States Attorney's Office for the Eastern District of Virginia, Norfolk Division.

      **IT IS SO ORDERED**.

Robert G. Doumar
Senior United Sta
UNITED STATES DISTRICT JUDGE
/s/
United States District Judge

Norfolk, VA
March 29, 2018